**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DEMARIO McNEIL,** <br> **Plaintiff,** <br><br> v. <br><br> **ESTATE OF SALEH OBAISI, M.D. et al.,** <br> **Defendants.** | Case No. 16-cv-11256 <br><br> Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Demario McNeil (McNeil), was incarcerated at Stateville Correctional Center between 2012 and 2016. During that time, he suffered multiple painful infections associated with recurrent ingrown toenails. McNeil asserts that Dr. Saleh Obaisi, M.D. (Dr. Obaisi), now deceased, as well as three co-defendants within the Stateville administration, violated his Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate indifference in the course of his medical treatment. McNeil seeks relief from Dr. Obaisi's estate.[1] Before the Court is defendant's motion for summary judgment. (Dkt. 73). For the reasons stated below, this motion for summary judgment is granted.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] On September 29, 2020, the Court granted Plaintiff's motion to substitute the Estate of Saleh Obaisi, Independent Executor Ghaliah Obaisi for defendant Dr. Obaisi. (Dkt. 101).

1

matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). Moreover, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [their] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White*, 829 F.3d at 841 (7th Cir. 2016) (citation omitted).

## BACKGROUND

### I. Parties and Procedural History

McNeil asserts claims against four defendants stemming from the medical treatment he received for ingrown toenails and resulting infections. Dr. Obaisi was employed as a physician and the Medical Director of the Stateville Correctional

2

Center while McNeil was incarcerated at that facility. The claims against Dr. Obaisi are the subject of this motion for summary judgment. Randy Pfister and Nicholas Lamb were the Warden and Assistant Warden of Stateville Correctional Center during the pertinent time period. Finally, John Baldwin was the acting Director of the Illinois Department of Corrections.[2]

McNeil filed his initial complaint *pro se* on December 9, 2016. After determining that his complaint alleged a colorable claim, the Court recruited counsel to assist him. Counsel filed an amended complaint on April 13, 2017 naming the same defendants and making substantially similar allegations of deliberate indifference in violation of the Eighth Amendment. (Dkt. 11). All four defendants filed their answers to the amended complaint in late 2017. (Dkts. 21, 31, and 34). After depositions and discovery, Dr. Obaisi's estate filed the present motion for summary judgment, which McNeil opposes.

**II. Local Rule 56.1**

Both the motion for summary judgment and McNeil's response included Local Rule 56.1 statements. Local Rule 56.1 statements "serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019) (citation omitted). "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to

---

[2] Warden Pfister, Director Baldwin, and Assistant Warden Lamb jointly filed a separate motion for summary judgment. (Dkt. 86).

3

a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012).

Local Rule 56.1 first requires that the party moving for summary judgment file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). The party opposing the motion for summary judgment must then file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citation omitted). In addition, the opposing party may submit a statement of additional facts that require the denial of summary judgment, to which the movant may respond. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

Local Rule 56.1 provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing L.R. 56.1(b)). In order to be deemed admitted, an uncontested fact to which an opponent does not adequately respond must also be supported by the evidence in the record. *See Keeton v. Morningstar, Inc.,* 667 F.3d 877, 880 (7th Cir. 2012).

However, one party's failure to comply with L.R. 56.1, does not automatically result in judgment for their opponent. *See Keeton,* 667 F.3d at 884 (citation omitted).

4

The proponent of a motion for summary judgment must still demonstrate that they are entitled to judgment as a matter of law, and the Court will still view all uncontested facts in the light most favorable to the non-movant, drawing all reasonable inferences in the non-movant's favor. *Id.*

Here Dr. Obaisi's estate submitted eighty (80) L.R. 56.1 statements. (Dkt. 72). Aside from the introductory L.R. 56.1 statements describing jurisdiction, venue and the parties, all of which were admitted, (Dkt. 95, Exhibit 2), McNeil failed to respond to the statements of uncontested fact. (Dkt. 72; Dkt. 95, Exhibit 2). McNeil did submit thirteen (13) additional statements of undisputed fact. (Dkt. 95, Exhibit 2). Dr. Obaisi's estate responded to these statements of undisputed fact in its reply. (Dkt. 98). Accordingly, the Court treats the parties' L.R. 56.1 statements as follows:

i. The defendant's first four statements (discussing parties, jurisdiction, and venue) are admitted by the plaintiff.

ii. The defendant's fifth, sixth, seventh, and eighth statements regarding deponent interviews are deemed admitted by the plaintiff. These statements identify the non-party deponent as Physician's Assistant LaTanya Williams and the expert witness as Dr. Kennon Tubbs.

iii. The defendant's remaining statements are deemed admitted to the extent that they are supported by the record and do not include improper arguments or legal conclusions. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (A party's statement of facts does not comply

          with Rule 56.1 if it contains "irrelevant information, legal arguments, and conjecture").

    iv.    The plaintiff's thirteen additional statements of fact are deemed uncontested where admitted by the defendant and are deemed contested facts where denied by the defendant.

### III. Medical Treatment

McNeil's ingrown toenail treatments are set out chronologically below.[3]

### A. Treatment Prior to Dr. Obaisi's Involvement

After McNeil arrived at Stateville in early 2012, he visited the Health Care Unit on January 25, 2012 and was diagnosed with an infected ingrown toenail on the big toe of his right foot. (Defendant's L.R. 56.1 Statement of Facts (DSOF), ¶ 33).[4] He was prescribed antibiotics for the infection. (*Id.*). On February 2, 2012, a bilateral nail resection was performed.[5] (*Id.*, ¶ 34). The procedure was performed again on March 15, 2012. (*Id.*, ¶ 34). Defendant's expert, who summarized McNeil's records, indicates that McNeil had "severely deformed ingrown nails on both great toes" on April 6, 2012 (only two months after his first resection, and a few weeks after his second resection).

---

[3] McNeil attached a limited set of medical records as exhibits to his original complaint. (Dkt. 1). These documents are not part of the summary judgment record. The Court has reviewed these additional records and is satisfied that even had these additional records been included in the summary judgment record, the result would have been the same.

[4] The Court will refer to Defendant Obaisi's Local Rule 56.1 Statement of Facts as DSOF.

[5] A bilateral nail resection is a "surgical procedure used to resolve an ingrown toenail." (DSOF, ¶ 21). During this procedure, "the nail wedge [the toenail that has become ingrown] is removed from the nail's matrix [the tissue that produces the nail] all the way back to the nail's root." (*Id.*). Because the full regrowth of a nail can take several months, the long-term effectiveness of a resection surgery is often not immediately clear. (*Id.*, ¶¶ 24–25).

(Dkt. 72, Exhibit C p. 2). On June 1, 2012, McNeil again presented with "swelling" and "discharge" around his right big toenail. (DSOF, ¶ 35). He was given Keflex, an antibiotic, and warm foot soaks. (*Id.*).

On July 5, 2012, McNeil returned to the Health Care Unit with the same symptoms. Because his toe infection had not been resolved by the Keflex, he was prescribed Bactrim, another antibiotic. (DSOF, ¶ 36). On August 14, 2012, McNeil once again brought his ingrown toenails and attendant infections to the attention of the Health Care Unit. He was switched to a third oral antibiotic, Doxycycline, combined with topical betadine ointment (DSOF, ¶ 37). This regimen of medications was to be accompanied by foot soaks, which were noted in McNeil's chart's on at least one subsequent date, August 15th. (*Id.*). On August 28, 2012, Physician's Assistant LaTanya Williams performed a "surgical excision" on at least one ingrown toenail.[6] (DSOF, ¶ 38).

### B. Treatment by Dr. Obaisi

Dr. Obaisi became Stateville Correctional Center's Director of Medicine in August of 2012. (DSOF, ¶ 4). On October 22, 2012, and again on March 8, 2013, Dr. Obaisi treated McNeil for his seizure disorder, not his ingrown toenails. (DSOF, ¶¶ 39–40). It was not until March 27, 2013, that Dr. Obaisi treated McNeil for the toenail condition. (DSOF, ¶ 41).

---

[6] This August 28th procedure is described by the defendant's expert as a "resection." (Dkt. 72, Exhibit C p. 2). The difference between an "excision" and a "resection" has not been elucidated by either party, and the two terms are used somewhat interchangeably in the filings.

7

Between the August 28, 2012 toenail excision and the March 27, 2013 appointment with Dr. Obaisi to address ingrown toenails, another clinician treated McNeil's toenails on February 4, 2013 with a prescription for Cipro, an antibiotic. (Dkt. 72, Exhibit C p. 2).

On March 27, 2013, Dr. Obaisi prescribed Keflex for McNeil's ingrown toenails. (DSOF, ¶ 41). He performed a bilateral nail resection surgery the following week, on April 4, 2013. He also gave McNeil a prescription for crutches and a "lay-in permit" which allowed him to take his meals in his cell. (DSOF, ¶ 42). At the follow-up visit eight days later, Dr. Obaisi noted McNeil was recovering well. (DSOF, ¶ 43). On May 5, 2013, Dr. Obaisi performed another resection on the same toe, this time as a "revision" to the first procedure. (DSOF, ¶ 44). At this appointment Dr. Obaisi once again prescribed crutches, a lay-in permit, and a permit to use shower shoes for one week. (*Id.*). A week later Dr. Obaisi removed McNeil's sutures and gave McNeil a permit to sleep in the lower bunk in a cell on the lower floor of the building. (DSOF, ¶ 45).

Between May 13, 2013 and July 12, 2015, McNeil was treated for seizures, a lipoma on his scalp, heartburn, and a common cold. (DSOF, ¶¶ 46–52). McNeil did not suffer from ingrown toenails or secondary infections during this time.

In mid-July 2015, McNeil visited the Health Care Unit complaining of an ingrown toenail. (DSOF, ¶ 53; Dkt. 72, Exhibit C p. 2). On August 15, 2015, McNeil was treated by a staff physician who diagnosed him with an ingrown toenail and referred him to Dr. Obaisi. Dr. Obaisi saw McNeil on September 9, 2015, and

8

performed another bilateral nail wedge resection surgery. On that date Dr. Obaisi also submitted a request for a referral to a podiatrist.[7] (DSOF, ¶¶ 55, 57). This referral request was approved at a "collegial review" meeting six days later, on September 15, 2015. (DSOF, ¶ 58). The record is not clear when a podiatry appointment was scheduled for McNeil, but on some date subsequent to September 15, 2015, a podiatry appointment was set for July 20, 2016. (*Id.*, ¶ 58).

On September 18, 2015, McNeil filed an emergency grievance requesting a podiatry appointment. (Plaintiff's L. R. 56.1 Statement of Facts, ¶ 1). On September 27, 2015, and then again on October 1, 2015, McNeil returned to the Health Care Unit and was seen by a physician's assistant for his ingrown toenails. The physician's assistant noted that McNeil was able to walk without assistance but prescribed him therapeutic shoes and foot baths. (DSOF, ¶¶ 59–60).

On November 2, 2015, McNeil wrote a letter to Assistant Warden Lamb requesting an expedited podiatry appointment. (Plaintiff's L. R. 56.1 Statement of Facts, ¶ 6).

On January 5, 2016, McNeil was prescribed another antibiotic, Augmentin, for his ingrown toenails. (DSOF, ¶ 62). Shortly thereafter, at two subsequent visits to the Health Care Unit to discuss seizures and a rash (February 11, 2016 and February

---

[7] The medical records attached to the plaintiff's original complaint indicate that McNeil saw clinicians for ingrown toenails on August 9th, August 17th, and August 31, 2015. (Dkt. 1, pp. 45–48). These visits do not appear in the defense expert's summary of medical treatment. (Dkt. 72, Exhibit C p. 2). Defendant asserts that on August 20th and 26th McNeil refused to attend medical appointments. These refusals would ordinarily be deemed admitted because plaintiff failed to deny them, but they must still be supported by the record. Here, the record indicates McNeil was seeking and receiving treatment during this time and McNeil testified at his deposition that he did not refuse treatment (Dkt. 72, Exhibit A p. 105–122). Therefore, this assertion about McNeil refusing treatment is not deemed admitted.

9

17, 2016) McNeil did not complain of toenail issues.[8] (DSOF, ¶¶ 63–64). In fact, a nurse noted on his chart that his toenail infection "was all dried up and resolved." (DSOF, ¶ 64) However, on March 29, 2016, a clinician noted that McNeil was once again experiencing toe pain and had still not been to see a podiatrist. That clinician prescribed him Tylenol and a topical antibiotic. (DSOF, ¶ 65).

On March 31, 2016, McNeil filed another grievance requesting a podiatry appointment. (Plaintiff's L. R. 56.1 Statement of Facts, ¶ 11).

On April 18, 2016, McNeil once again visited the Health Care Unit complaining of an ingrown toenail. At this appointment a nurse noted in his medical chart that he had "tried digging it [the ingrown toenail] out and trimming it myself." (DSOF, ¶ 66).

On April 20, 2016, McNeil was transferred to Western Illinois Correctional Center. (DSOF, 67). At that facility, Mr. McNeil was prescribed the antibiotic clindamycin for his ingrown toenail on May 5, 2016. (DSOF, ¶ 68).

A few weeks later, on May 18, 2016, Western Illinois Correctional Center confirmed McNeil's appointment with a podiatrist on July 20, 2016. (DSOF, ¶ 69). In the months between his transfer on April 20, 2016 and his podiatry appointment on July 20, 2016, McNeil filed additional grievances requesting that the podiatry appointment be expedited. (Plaintiff's L. R. 56.1 Statement of Facts, ¶ 11).

The podiatrist recommended an ablation procedure to permanently prevent ingrown toenails. (DSOF, ¶ 70. An ablation involves the use of chemicals to damage

---

[8] The Court notes that the medical records attached to plaintiff's original complaint detail that on March 18, 2016, a clinician noted that McNeil asked again about a podiatry appointment. (Dkt. 1, p. 58). On March 26, 2016 a clinician noted swelling and pain of the toe. (Dkt. 1, p. 60).

10

the nail matrix, preventing the future growth of toenails. (DSOF, ¶ 26). The ablation procedure was performed by the podiatrist on August 15, 2016. By all accounts it was a success, permanently preventing further ingrown toenails. (DSOF, ¶ 71).

## ANALYSIS

### I. Deliberate Indifference

Claims can be brought under 42 U.S.C. § 1983 against any person who, under color of state law, "subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The constitutional right at issue here is the Eighth Amendment prohibition on "cruel and unusual punishment." A prisoner "must rely on prison authorities to treat his medical needs," and because "denial of medical care can result in pain and suffering" that serves no penological purpose, "deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain [which is] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (quotations and citations omitted).

McNeil argues that the medical treatment he received from Dr. Obaisi violated the Eighth Amendment because Dr. Obaisi was deliberately indifferent to a serious medical need, his ingrown toenails. In order to survive summary judgment, McNeil must demonstrate both that (1) he suffered an objectively serious medical condition;

11

and that (2) the defendant was (subjectively) deliberately indifferent to that condition. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).[9]

### A. Objectively Serious Medical Need

McNeil had multiple infected ingrown toenails while at Stateville Correctional Center. The defendant argues that his condition was not objectively serious ("To be sure, an ingrown toenail might temporarily hurt until it is clipped"). (Dkt. 73, p. 3). This Court disagrees.

As the defendant aptly points out, not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997). Rather, as the plaintiff and defendant agree, an objectively serious medical condition is one that has either "been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Foelker v. Outagamie County*, 394 F.3d 510, 512 (7th Cir. 2005) (citations omitted).

McNeil was repeatedly diagnosed with ingrown toenails by Stateville doctors. (DSOF, ¶¶ 37, 55, 57). He was prescribed multiple courses of antibiotics and various pain medications. (DSOF, ¶¶ 33–65). During this course of treatment he was periodically instructed to use crutches (DSOF, ¶¶ 42–44), soak his feet (DSOF, ¶¶ 35, 36, 37, 60), wear therapeutic shoes (DSOF, ¶¶ 44, 60), and take his meals in his cell

---

[9] The defendant describes a three-part test rather than a two-part test, but the difference is semantic, with subjective awareness and a culpable mental state being considered together in the two-part articulation and separately in the three-part articulation.

for days at a time (DSOF, ¶¶ 42, 44). Eventually, his ingrown toenails required surgical intervention, and McNeil had to undergo multiple excisions and resections. (DSOF, ¶¶ 33–65). There has been no suggestion by the defendant that this course of treatment was anything less than "mandatory," given the severity of the symptoms. The Court finds the requirements for an objectively serious medical condition "diagnosed by a physician as mandating treatment" are met. *Foelker*, 394 F.3d at 512. *See Werner v. Jones*, No. 15 CV 103, 2018 WL 317843, at *4 (E.D. Wis. Jan. 5, 2018) ("Here, the court finds that the pain caused by Werner's ingrown toenail suggests that this is a serious medical condition"); *Fisher v. Larson*, No. 15 CV 0301, 2015 WL 1746381, at *2 (S.D. Ill. Apr. 14, 2015) ("Plaintiff had an ingrown toenail that caused him significant pain and discomfort over several months. Eventually, the toenail became infected and had to be removed. These allegations meet the threshold requirement for a 'serious' medical condition").

The defendant's cases are not persuasive. In *Dobbs v. Sood*, although the plaintiff alleged lacerations to his toe caused by long toenails, "he [did] not allege that any infection in fact resulted." No. 01 C 4899, 2003 WL 22232917, at *7 (N.D. Ill. Sept. 16, 2003). Moreover, while summary judgment was granted to the defendant, the *Dobbs* Court declined to decide that ingrown toenails were not an objectively serious medical issue, assuming the opposite and ruling against the plaintiff on other grounds. *Id.* Likewise, in *Wallace v. Powers*, the Court did not determine whether an ingrown toenail was an objectively serious medical condition, instead basing its

13

holding on the defendant's conscientious course of treatment (*i.e.* the subjective prong). No. 09 CV 224, 2009 WL 4015558, at *4 (S.D. Ill. Nov. 19, 2009).

Finally, contrary to the defendant's characterization, in *Hamilton v. Santos*, the Court found at the summary judgment stage that "[a] question of fact exists as to whether Plaintiff's toe infection constituted a serious medical need." This case does not support the defendant's argument that the objective prong of the test for deliberate indifference cannot be satisfied by an ingrown toenail. No. 18 CV 577, 2019 WL 2605199, at *3 (S.D. Ill. May 22, 2019).

**B. Defendant's Deliberate Indifference**

Next the Court considers whether Dr. Obaisi knew of and disregarded a substantial risk to McNeil's health. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). An "inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105 (quotation and citation omitted). In order to satisfy the subjective prong of the deliberate indifference test, a "showing of mere negligence is not enough." *Petties*, 836 F.3d at 728. The requisite mental state "approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (citation omitted). And "even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728 (citation omitted). "[T]he evidence must show that the prison official acted with a sufficiently culpable state of mind, meaning the official knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Goodloe*, 947

14

F.3d at 1030–31 (quotations omitted). However, McNeil does *not* need to show that Dr. Obaisi "intended harm or believed that harm would occur" *Petties*, 836 F.3d at 728.

McNeil has not made a *direct* showing that Dr. Obaisi's state of mind amounted to negligence or recklessness, much less exceeded it. But this is, as the Seventh Circuit has noted, not unusual. "Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'" *Petties* 836 F.3d at 728. Instead, McNeil has attempted to make an indirect showing that Dr. Obaisi had the requisite state of mind. This can be done in several ways, and McNeil makes various arguments, all derived from *Petties v. Carter*.

i. <u>Obviousness of Risk</u>

McNeil argues that "[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. However, McNeil acknowledges that in such cases "a medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id*. Evidence of such a departure can be found "when a doctor refuses to take instructions from a specialist," when he or she fails to "follow an existing protocol" or when "a prison official persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 729–30.

15

McNeil has failed to provide any evidence showing that the risks associated with using resection or excision procedures coupled with antibiotics to treat ingrown toenails were "obvious enough" to show that Dr. Obaisi knew about such risks and disregarded them under the *Petties* standard. Nothing in the record indicates that Dr. Obaisi refused to follow the instructions of a specialist, refused to follow an existing protocol for treatment, or persisted in a course of treatment known to be ineffective. The third of these arguments is the most relevant to the facts of this case. McNeil was subjected to, by this Court's count, about a half-dozen resection or excision surgeries and at least eight courses of oral antibiotics (performed and prescribed by a number of providers within the Illinois Department of Corrections). On the other hand, there was a two-year period between 2013 and 2015 during which McNeil did not report ingrown toenails, indicating that this course of treatment was effective for a period of time. Moreover, according to uncontroverted expert testimony provided by Dr. Tubbs, the defendant's expert, the medical care dispensed by Dr. Obaisi was well within the bounds of "professional judgment, practice, or standards" and was in fact a course of treatment that Dr. Tubbs himself often follows. (DSOF, ¶ 74). As the defendant correctly argues, a plaintiff must show that "no minimally competent medical professional would have so responded under these circumstances." *Walker v. Wexford Health Sources, Inc.* 940 F.3d 954, 965 (7th Cir. 2019). Dr. Tubbs is one such competent medical professional, and his deposition testimony establishes that the conservative treatment of ingrown toenails by general practitioners with resections and antibiotics amounts to competent medical care.

16

(DSOF, ¶¶ 72–77). Therefore, no reasonable jury could conclude that Dr. Obaisi acted with a sufficiently culpable mental state to find that he acted with deliberate indifference.

ii. Delay

McNeil also argues that "inexplicable delay in treatment which serves no penological interest" can constitute evidence that the subjective prong of the test for deliberate indifference is satisfied if there is independent evidence that such delay "exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730. The delay here is the ten months between when Dr. Obaisi requested McNeil be scheduled for a podiatry appointment and when he was actually scheduled for a podiatry appointment. (DSOF, ¶ 74). However, the Seventh Circuit has held, as McNeil acknowledges, that "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730.

The defendant has argued that "the Plaintiff also lacks any verifying medical evidence that the alleged 'delayed' medical treatment actually caused him harm." This is not persuasive, since the Seventh Circuit has found that unnecessarily prolonged pain is harm enough. *Petties*, 836 F.3d at 730. The independent evidence that McNeil was in pain while he waited for a podiatry appointment can be found in the medical records. According to the records, during the ten-month delay McNeil was treated with both antibiotics and pain medication for his ingrown toenails. (DSOF, ¶¶ 59, 60, and 65). However, this is not dispositive.

17

*Petties* stands for the proposition that an *inexplicable* delay in treatment can be evidence of a medical professional's subjective knowledge of a substantial risk to an inmate. In this case, although the defendant is no longer here to offer an explanation, his expert witness has offered one possibility. Namely, that after Dr. Obaisi performed his final toenail resection on McNeil in September 2015, and determined that a podiatry visit was the correct way to proceed, McNeil would have had to wait several months for the afflicted toenail to grow back before a podiatrist would be able to treat it. This may not be the only explanation for the delay, since the defendant's own statements of uncontroverted fact indicate that toenail regrowth takes four months, not ten months. (DSOF, ¶ 24). However, when viewing the remaining six months of unexplained delay the Court must consider "the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730. McNeil has offered no evidence to contradict the expert witness's explanation for at least a four month delay, nor has he provided any evidence that a six month delay amounts to deliberate indifference when considering the seriousness of his condition or the relative difficulty of providing a podiatry appointment. Therefore, the Court must find that the length of the delay was not inexplicable. Further, based on all these considerations, the Court finds that no reasonable jury could find that Dr. Obaisi was deliberately indifferent based on the delay between requesting the podiatry appointment and the appointment taking place.

## CONCLUSION

For the aforementioned reasons, the Estate of Saleh Obaisi's motion for summary judgment is granted. The Clerk is directed to enter judgment in favor of the Estate of Dr. Saleh Obaisi and against Demario McNeil.

E N T E R:

Dated: November 2, 2020

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge