IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEMARIO McNEIL,<br><br>**Plaintiff,**<br><br>v.<br><br>ESTATE OF SALEH OBAISI, M.D. et al,<br><br>**Defendants.** | Case No. 16-cv-11256<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Demario McNeil (McNeil), was incarcerated at Stateville Correctional Center (Stateville) between 2012 and 2016. During that time, he suffered multiple painful infections associated with recurrent ingrown toenails. He was treated by several medical professionals, including Dr. Saleh Obaisi, M.D. ("Dr. Obaisi") a co-defendant in this case.[1] McNeil complained about delays in treatment to several administrators, including Randy Pfister, the Warden of Stateville Correctional Center (Warden Pfister), John Baldwin, the acting Director of the Illinois Department of Corrections (Director Baldwin), and Nicholas Lamb, the Assistant Warden at Stateville Correctional Center (Assistant Warden Lamb).

McNeil contends that Warden Pfister, Director Baldwin, and Assistant Warden Lamb acted with deliberate indifference towards his medical condition in

---

[1] Dr. Obaisi has since passed away, but his estate was substituted as a party on September 29, 2020. (Dkt. 101). The estate filed a motion for summary judgement (Dkt. 73), and the Court has issued a separate order granting that motion. (Dkt. 104).

1

violation of his Eighth Amendment right to be free from cruel and unusual punishment. Warden Pfister, Director Baldwin and Assistant Warden Lamb have filed a joint motion for summary judgment. (Dkt. 86). For the reasons stated below, the motion is granted.

## **LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323 (1986). After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). Moreover, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [their] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the

motion for summary judgment." *White*, 829 F.3d at 841 (7th Cir. 2016) (citation omitted).

## BACKGROUND

### I. Local Rule 56.1

Both the motion for summary judgment and McNeil's response included Local Rule 56.1 statements. Local Rule 56.1 statements "serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019) (citation omitted). "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012).

Local Rule 56.1 requires that the party moving for summary judgment file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). The party opposing the motion for summary judgment must then file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citation omitted). In addition, the opposing party may submit a statement of additional facts that require the denial of summary judgment, to which

the movant may respond. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

Local Rule 56.1 provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing L.R. 56.1(b)). In order to be deemed admitted, an uncontested fact to which an opponent does not adequately respond must also be supported by the evidence in the record. *See Keeton v. Morningstar, Inc.,* 667 F.3d 877, 880 (7th Cir. 2012).

However, one party's failure to comply with L.R. 56.1, does not automatically result in judgment for their opponent. *See Keeton,* 667 F.3d at 884 (citation omitted). The proponent of a motion for summary judgment must still demonstrate that they are entitled to judgment as a matter of law, and the Court will still view all uncontested facts in the light most favorable to the non-movant, drawing all reasonable inferences in the non-movant's favor. *Id.*

The defendants submitted fifty-two (52) L.R. 56.1 statements. (Dkt. 87). Aside from the introductory facts describing jurisdiction, venue and the parties, all of which were admitted, (Dkt. 94, Exhibit 2), McNeil failed to respond to the statements of uncontested fact. (Dkt. 87; Dkt. 94, Exhibit 2). McNeil did submit twelve (12) additional statements of undisputed fact. (Dkt. 94, Exhibit 2). The defendants responded to these statements of fact in their reply. (Dkt. 102). Accordingly, the Court treats the parties' L.R. 56.1 statements as follows:

4

      i.      The defendants' first six statements (discussing parties, jurisdiction, and venue) are admitted by the plaintiff.

     ii.      The defendants' forty-six (46) remaining statements are deemed admitted to the extent that they are supported by the record and do not include improper arguments or legal conclusions. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (A party's statement of facts does not comply with Rule 56.1 if it contains "irrelevant information, legal arguments, and conjecture").

    iii.      The plaintiff's twelve (12) additional statements of fact are deemed uncontested where admitted by the defendants and are deemed contested facts where denied by the defendants.

**II. Medical Treatment**

The Court assumes familiarity with the order granting summary judgment to the Estate of Dr. Obaisi and describing McNeil's long medical history in detail. (Dkt. 104). In brief, McNeil arrived at Stateville in early 2012 and was diagnosed with ingrown toenails almost immediately. (Defendants' L.R. 56.1 Statement of Facts (DSOF), ¶¶ 7–8).[2] From January through August he was treated by various clinicians. He received multiple courses of antibiotics (January 25, 2012, June 1, 2012, July 5, 2012, and August 14, 2012, February 4, 2013), several bilateral nail resection and excision surgeries, (February 2, 2012, March 15, 2012, August 28,

---

[2] The Court will refer to the defendants' Local Rule 56.1 Statement of Facts at DSOF.

2012), and two rounds of daily foot soaks (June 1, 2012, August 14, 2012). (DSOF, ¶ 9; Dkt. 87, Exhibit 6 at 2).

Dr. Obaisi first treated McNeil's ingrown toenails on March 27, 2013, prescribing him a sixth round of antibiotics and scheduling him for another bilateral nail resection surgery the following week. (Dkt. 87, Exhibit 6 at 2). Dr. Obaisi performed this surgery (McNeil's fourth) on April 4, 2013 and gave him a prescription for crutches as well as a "lay-in permit." (*Id.*). On May 5, 2013, Dr. Obaisi performed a fifth resection surgery, and once again prescribed crutches, a lay-in permit, and a permit to use shower shoes for one week. (*Id.*). At a follow-up visit McNeil received a permit to sleep in the lower bunk in a cell on the lower floor of the building.

Between May 13, 2013 and July 12, 2015, McNeil received no treatment for ingrown toenails or secondary infections. (DSOF, ¶ 9). In July of 2015, McNeil had a resurgence of his ingrown toenail condition and visited the Health Care Unit complaining of an ingrown toenail once again. (Dkt. 87, Exhibit 6 at 2). On September 9, 2015, after several more appointments, Dr. Obaisi performed a sixth bilateral nail wedge resection surgery. (*Id.*). Dr. Obaisi also submitted a request for a referral to a podiatrist, which was discussed and approved at a "collegial review" meeting on September 15, 2015. (*Id.*). Neither the parties' statements of uncontroverted facts nor the supporting exhibits are clear as to when the podiatry appointment was made for McNeil, but on some date subsequent to September 15, 2015, a podiatry appointment was set for July 20, 2016. (*Id.*).

McNeil continued to receive treatment for his ingrown toenails while he waited for a podiatry appointment (including appointments on September 27, 2015, October 1, 2015, January 5, 2016, March 29, 2016, April 18, 2016), and was prescribed more foot soaks (October 1, 2015), antibiotics, (January 5, 2016), and pain medications (March 29, 2016). (*Id.*).

On July 20, 2016, McNeil was seen by a podiatrist. (*Id.*). He received an ablation procedure, in which chemicals are used to damage the nail matrix, preventing the future growth of toenails. By all accounts it was a success, permanently preventing McNeil from growing toenails on the afflicted toes and preventing ingrown toenails. (*Id.*).

**III. Grievances**

The grievance process begins when a prisoner submits a form to his counselor describing the situation and requesting relief. (Dkt. 87, Exhibit 2 at 133–34). Once the counselor has researched the grievance and responded, an inmate has the option to appeal. (Dkt. 87, Exhibit 3 at 14). The grievance appeals process varies based on whether the prisoner marked the grievance as an "emergency." (Dkt. 87, Exhibit 2 at 134). After getting an initial response to a *non*-emergency grievance from the grievance officer, a prisoner can "send it to Springfield" and appeal to the Illinois Department of Corrections' "Administrative Review Board." (Dkt. 87, Exhibit 3 at 15; Dkt. 87, Exhibit 2 at 135).

Alternatively, if a prisoner checked the "emergency" box on their grievance appeal, it goes straight to the warden of their facility. (Dkt. 87, Exhibit 2 at 135). If

7

the warden agrees that the grievance constitutes an emergency, he will attempt to resolve it; if the warden does not find it to constitute an emergency, he will return the grievance to the prisoner, so that he can appeal it to the Administrative Review Board. (*Id.*)

On September 18, 2015, McNeil filed a grievance marked as an "emergency," requesting a podiatry appointment. (DSOF, ¶ 12). Although McNeil had been approved for a podiatry visit on September 15, 2015, he did not know about this approval (DSOF, ¶ 12; Dkt. 87, Exhibit 2 at 137–38). Neither party has presented evidence that an appointment was scheduled when this grievance was filed. The September 18 grievance was reviewed on October 9, 2015 by someone in the Warden's office at Stateville and designated a non-emergency. (DSOF, ¶¶ 12–13). The signature on that non-emergency determination reads "N. Lamb." (Dkt. 87, Exhibit 2 at 139). However, Assistant Warden Lamb stated in his deposition that "somebody signed off for me" on the September 18 grievance. (Dkt. 87, Exhibit 4 at 12–13). And as Warden Pfister described in his deposition, "it looks like a designee signed that because there is initials over here, which is a requirement if someone other than Mr. Lamb signs." (DSOF, ¶ 12; Dkt. 87, Exhibit 3 at 24). After his grievance was deemed a non-emergency, McNeil appealed that non-emergency designation to the Administrative Review Board but apparently failed to attach the grievance itself and the grievance officer's response. (DSOF, ¶ 14). At that time Director Baldwin had appointed designees to review grievances that were appealed to the Administrative Review

8

Board and to sign Director Baldwin's name on grievance dispositions. (DSOF, ¶¶ 50–51).

McNeil resubmitted his grievance to the Stateville grievance officer. This officer made the determination that no additional administrative action was necessary because, as of October 28, 2015 "according to medical records [McNeil is] approved to go to an outside treatment for this and the [Health Care Unit] is awaiting a phone call to schedule from the outside hospital. On 10/1/15 [McNeil] was treated by Dr. Williams as well." (Dkt. 87, Exhibit 3 at 24). On February 17, 2016 the life-cycle of this grievance was concluded when a designee of Warden Pfister concurred with the grievance officer's findings. (*Id*., ¶ 16).

On November 2, 2015, while this first grievance was making its way through the appeals process, McNeil wrote a letter to Assistant Warden Lamb requesting an expedited podiatry appointment and describing how his feet "constantly bleed, swell, and leak a pus-like [*sic*] fluid." (Plaintiff's L.R. 56.1 Statement of Facts, ¶ 6). During discovery McNeil provided a hand-written copy of this letter. Assistant Warden Lamb has no recollection of receiving such a letter. (DSOF, ¶ 35). Lamb did not have a designee review his mail and testified in his deposition that such a letter, properly addressed to him "should have come directly" to him and "usually came directly" to him. (Dkt. 87, Exhibit 4 at 35).

Additionally, McNeil stated in his deposition that on an unknown date he spoke with Assistant Warden Lamb in person about his ingrown toenails. (DSOF, ¶ 33). According to McNeil, he voiced this complaint while Assistant Warden Lamb was

9

walking through 3 Gallery, E House, and McNeil was in cell 318. (Dkt. 87, Exhibit 2 at 158–59). McNeil elaborated that Lamb did not respond to McNeil's verbal complaint on this occasion, but that a correctional officer who was accompanying him advised McNeil to sign up for a sick call. (*Id.*).

McNeil testified at his deposition that he sent another letter containing substantially similar complaints directly to Warden Pfister. (Dkt. 87, Exhibit 2 at 155). Warden Pfister does not recall ever having received or read such a letter. (DSOF, ¶ 31). When asked whether he personally reviewed mail from inmates, Warden Pfister responded that "the ladies out front always handled it." (Dkt. 87, Exhibit 3 at 46).

On January 3, 2016, McNeil filed his second grievance. (DSOF, ¶ 18). This grievance was denied, based on the fact that despite not yet having seen a podiatrist, McNeil was still being seen by Stateville's own medical staff and had been approved to see a podiatrist. (*Id.*). McNeil once again appealed this denial to the Administrative Review Board. (DSOF, ¶ 19). This appeal was rejected, and the response indicated: "Concurred, John R. Baldwin." (*Id.*). Director Baldwin's affidavit indicates that he does not "recall personally receiving or reviewing any correspondence from [McNeil] while [he] was the Director of IDOC" including any grievances appealed to the Administrative Review Board. (Dkt. 87, Exhibit 5 at 1–2). This is likely because he "appointed designees to review and sign ARB responses to inmate grievances on [his] behalf." (*Id.*).

10

On March 31, 2016, McNeil filed a third emergency grievance requesting a podiatry appointment. (DSOF, ¶ 20). A grievance officer designated by Warden Pfister once again determined that this was not in fact an emergency. (DSOF, ¶ 21). McNeil submitted a third appeal to the Administrative Review Board, but when he was asked to submit additional information he did not respond. (DSOF, ¶ 22).

On May 31, 2016, McNeil filed a fourth grievance once again requesting a podiatry appointment. (Dkt. 87, Exhibit 3 at 36). This grievance was signed with Warden Pfister's name, but when deposed he stated that the signature was "not personally mine." (Dkt. 87, Exhibit 3 at 36, 45–46). Warden Pfister stated in his deposition that his "designee, whoever it was, determined it [was] [*sic*] not an emergency." (*Id*., at 36). With regard to designees, Warden Pfister further stated that at this time he had "four or five of them that did grievances", and it was customary for them to sign on his behalf without consulting him. (*Id*., at 37).

In the months between his transfer on April 20, 2016 and his podiatry appointment on July 20, 2016, McNeil filed additional grievances requesting that his podiatry appointment be expedited. (Plaintiff's L.R. 56.1 Statement of Facts, ¶ 11).[3]

On August 5, 2016, after attending his podiatry appointment, McNeil mailed one final hand-written letter to Director Baldwin. In this letter he requested an

---

[3] McNeil was transferred to Western Correctional Center on April 20, 2016. (DSOF, ¶ 23). After arriving at Western Correctional Center, McNeil was transferred back the Northern Reception Center at Stateville for several weeks while he continued receiving medical treatment for his infected toes. (Dkt. 87, Exhibit 3 p. 128). McNeil returned to Western Correctional Center in May of 2016 and was residing there when he saw a podiatrist on July 20, 2016. (*Id*.). These additional grievances were directed towards the administration of Western Correctional Center.

11

answer to an earlier grievance that had been submitted to the ARB. (Dkt. 87, Exhibit 2 at 167).

## ANALYSIS

### I. Deliberate Indifference

Claims can be brought under 42 U.S.C. § 1983 against any person who, under color of state law, "subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. The constitutional right at issue in this case is the Eighth Amendment prohibition on "cruel and unusual punishment." A prisoner "must rely on prison authorities to treat his medical needs," and because "denial of medical care can result in pain and suffering" that serves no penological purpose, "deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain [which is] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) (quotations and citations omitted).

McNeil argues in his motion opposing summary judgment that the "[d]efendants – themselves and through their designees – knew about and disregarded his grievances related to his foot issues." (Plaintiff's Motion Opposing Summary Judgment at 1). In order to survive summary judgment, McNeil must demonstrate both that (1) he suffered an objectively serious medical condition; and that (2) the defendant was (subjectively) deliberately indifferent to that condition. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Defendants do not dispute that

McNeil suffered an objectively serious medical condition.[4] The second prong of the test for deliberate indifference requires that the defendant (a) actually knew of and (b) consciously disregarded a substantial risk to an inmate's health. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

A. Actual Knowledge

In order to satisfy the subjective part of the deliberate indifference test, a showing of what amounts to criminal recklessness must be made. *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994) ("subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."). A "showing [of] mere negligence is not enough." *Petties*, 836 F.3d at 728; *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994). And "even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728 (citation omitted). The requisite mental state "*approaches* intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (citation omitted) (emphasis added), but McNeil does *not* need to show that the defendants "intended harm or believed that harm would occur" *Petties*, 836 F.3d at 728.

The defendants correctly argue that prison officials are "entitled to relegate to the prison's medical staff the provision of good medical care." (Dkt. 86 at 3, citing

---

[4] For a more detailed treatment of this prong of the deliberate indifference test, see the Opinion and Order granting the motion for summary judgment filed by co-defendant, Dr. Obaisi. (Dkt. 104).

13

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)). In addition, prison officials may delegate bureaucratic duties to their inferiors, and their "liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks*, 555 F.3d at 595; *see also Pacelli v. deVito*, 972 F.2d 871, 878 (7th Cir. 1992) ("Supervisors are not liable for the errors of their subordinates") (citations omitted).

Based on the summary judgment record and drawing all inferences in McNeil's favor, the personal knowledge of each defendant is summarized below:

i. <u>Warden Pfister</u>

McNeil filed grievances with Warden Pfister and sent him a letter. However, Warden Pfister testified that at the time McNeil was filing grievances they were being reviewed by designees, who were authorized to sign on his behalf. (Dkt. 87, Exhibit 3 at 36, 45–46). He has no recollection of ever reviewing a grievance from McNeil. Warden Pfister also testified that he did not receive or review mail that was sent to his office by prisoners. He delegated that duty as well. (Dkt. 87, Exhibit 3 at 46). Drawing all reasonable inferences in McNeil's favor (i.e. that the letter was sent and that it was received) there is no evidence to suggest that Warden Pfister was personally aware of McNeil's condition.

ii. <u>Director Baldwin</u>

Likewise, Director Baldwin has submitted an affidavit indicating that his designees always reviewed and signed grievance appeals like McNeil's on his behalf. McNeil has not submitted any evidence indicating that Director Baldwin himself

14

reviewed those appeals, and Director Baldwin contends that he has no memory of them.

This leaves only the letter to Director Baldwin. Director Baldwin has no recollection of receiving a letter from McNeil, but there is no evidence in the record suggesting that Director Baldwin was *not* receiving and reading his own mail. A reasonable jury could find that McNeil actually sent a letter to Director Baldwin, that the letter turned over during discovery was a true copy of that letter, that the letter reached Director Baldwin, and that he read it. However, McNeil wrote the letter in question on August 5, 2016, after he had already attended his podiatry appointment. Moreover, the letter did not describe McNeil's ingrown toenail condition (which in any case had been resolved by that point) so it could not have given rise to actual knowledge of a substantial risk to McNeil's pain regarding his ingrown toenails.

    iii.    <u>Assistant Warden Lamb</u>

Based on all the evidence in the summary judgment record, a reasonable jury could conclude that Assistant Warden Lamb had actual knowledge of McNeil's grievances. Such knowledge could not have come from the grievances, which were reviewed and initialed by Assistant Warden Lamb's designees.

That said, McNeil testified that he approached Assistant Warden Lamb to explain his condition in person. Although the defendant currently has no recollection of that encounter, a reasonable jury could credit the testimony of both men and conclude that Assistant Warden Lamb at one time had actual knowledge of McNeil's toenail condition. In addition, McNeil has provided a copy of a letter that he testified

15

he sent to Assistant Warden Lamb. Although Assistant Warden Lamb currently has no memory of receiving this letter, he acknowledges that (unlike Warden Pfister) he routinely opened his own mail and might have received it. (Dkt. 87, Exhibit 4 at 35). Drawing all reasonable inferences in McNeil's favor (*i.e.* that he actually wrote and sent such a letter, and that Assistant Warden Lamb actually received and read it) a jury could conclude that Assistant Warden Lamb had actual knowledge that McNeil suffered from ingrown toenails and was requesting a podiatry appointment. This does not, however, settle the matter.

### B. Disregarding the risk

In addition to *actually knowing* about a substantial risk to a prisoner's health, a defendant must *disregard* that risk. In the Seventh Circuit, a prison official cannot be found to have disregarded a risk merely because they denied a grievance or other complaint. *See, for example, Johnson v. Doughty*, 433 F.3d 1001, 1005 (7th Cir. 2006) (Prison officials whose interactions with plaintiff were "limited to dealing with his grievances and other complaints about the hernia treatment [. . .] were not deliberately indifferent to that need because they took [the plaintiff's] medical complaints seriously and reasonably relied upon the doctors' recommendations in handling [the plaintiff's] condition"). So long as prisons officials were making sure that "medical care was available" while these grievances were processed, their actual ruling on a grievance or complaint does not constitute deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006). Even if a prison official had actual knowledge of a substantial risk to a prisoner's health based on information

16

contained in grievances or other complaints, denial of a grievance based on a doctor's reassurances that reasonable care was being administered does not constitute disregard. *Id*. As the defendants correctly argue in their brief, a claim of deliberate indifference cannot rest on an incarcerated person claiming he was denied "specific care" or the "best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

McNeil claims to have sent Assistant Warden Lamb a letter on November 2, 2015. In November of 2015, McNeil had been waiting a little over a month for a podiatry appointment. His first grievance was still being processed by the Administrative Review Board, and he was continuing to receive care for his condition at the Medical Unit. These facts closely mirror the facts of *Johnson*, wherein the Seventh Circuit affirmed a grant of summary judgment in favor of several prison officials. Even assuming Assistant Warden Lamb read McNeil's letter and failed to take any action, no reasonable jury could find his decision to entrust McNeil's care to the professionals in the Medical Unit at that point and allow the grievance process to run its course was deliberate indifference.

McNeil cannot remember the date on which he made a verbal complaint regarding his ingrown toenails to Assistant Warden Lamb. The Court may (indeed must) credit McNeil's testimony and assume that this interaction occurred, but it was still a "grievance or complaint" and is therefore governed by *Johnson*, 433 F.3d. at 1005. McNeil acknowledges that the correctional officer accompanying Assistant Warden Lamb acknowledged his verbal complaint and instructed him to make a sick call. Without more evidence, no reasonable jury could find that Assistant Warden

Lamb did anything other than "[take the plaintiff's] medical complaints seriously and reasonably rel[y] upon the doctors' recommendations in handling [the plaintiff's] condition" while making sure that "medical care was available." 433 F.3d 1001, 1005 (7th Cir. 2006). The lack of evidence about this interaction does not create a question of whether Assistant Warden Lamb had actual knowledge of a substantial risk to McNeil's health and disregarded it as McNeil argues; rather, that lack of evidence means that McNeil has failed to raise such a question.[5]

## CONCLUSION

For the aforementioned reasons, the defendants' motion for summary judgment (Dkt. 86) is granted. Judgment is granted in favor of Randy Pfister, John Baldwin, and Nicholas Lamb and against Demario McNeil. Civil case terminated.

E N T E R :

Dated: November 2, 2020

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

---

[5] Having found that there is insufficient evidence of defendants' actual knowledge and disregard, the Court need not decide whether McNeil suffered a detriment by being forced to wait 10-months for a podiatry appointment.

18